Filed 7/18/16  P. v. Medina CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEX JOSEPH MEDINA,<br><br>    Defendant and Appellant. | 2d Crim. No. B253317<br>(Super. Ct. No. 2009024052)<br>(Ventura County) |

Appellant Alex Joseph Medina, a 14-year-old Hispanic gang member, and victim Seth Scarminach, a 16-year-old associate of a rival gang with a "White pride" ideology, exchanged words and challenges at a party.  Scarminach moved on to another party and appellant followed him.  Words were again exchanged and the two agreed to fight.  After each of them had exchanged a few punches, appellant pulled out a large kitchen knife and stabbed Scarminach in the stomach.  He then jumped on top of his fallen victim and repeatedly stabbed him.  One of the wounds fatally penetrated all the way through Scarminach's heart, and another cut his right carotid artery.

A jury convicted appellant of first degree murder (Pen. Code, § 187, subd. (a)).[1] The jury also found true allegations that he (1) personally used a deadly weapon, i.e., a knife (§ 12022, subd. (b)(1)); (2) intentionally killed the victim while an active participant in a criminal street gang and carried out the crime to facilitate the gang's activities (§ 190.2, subd. (a)(22)); and (3) committed the crime for the benefit of, at the direction of, or in association with a gang (§ 186.22, subd. (b)(1)).  The trial court sentenced him to 26 years to life with the possibility of parole.

Appellant contends the evidence is insufficient to sustain his conviction of first degree murder and that the court erred in failing to instruct on lesser included offenses.  He further contends that the court erred in refusing to permit him to testify after both sides had rested and it had been decided that instructions on manslaughter would not be given.  He also asks us to examine the sealed record of the court's in camera proceeding to determine if the court erred in failing to order the release of Scarminach's mental health records.  We affirm.

STATEMENT OF FACTS

*Prosecution*

On April 25, 2009, appellant was a member of the Ojai Surenos Lokos (OSL), a Latino criminal street gang with allegiance to the Mexican Mafia. The victim, 16-year-old Seth Scarminach, was a member or associate of OSL's primary rival, the Meiners Oaks Boys (MOB) gang.  OSL members adopted the color blue as a symbol and commonly wore blue bandanas and jerseys, while MOB

---

[1] Unless otherwise noted, all statutory references are to the Penal Code. Appellant was 14 years old when he committed the crime and was charged as an adult based on allegations he personally killed the victim and acted for the benefit of a criminal street gang (Welf. & Inst. Code, § 707, subds. (d)(2)(A) & (d)(2)(C)(ii)).  Five months after the complaint was filed, a doubt was declared as to his mental competency and the criminal proceedings were suspended.  In July 2012, the jury found appellant competent to stand trial and the proceedings were reinstated.

2

members wore red bandanas and shoelaces. MOB members were primarily Caucasian and wore red in part to connote "White power."

Early that evening, Veronica Vaughan drove appellant and fellow OSL members Rutilio "Pelon" Huerta and Gabriel "Danger" Arellano to a house party on the east end of Ojai. Meanwhile, Scarminach went to a party in the Arbolada neighborhood of Ojai with Eric Nestingen, Forrest Whitman, and Alex Luna. Scarminach, Nestingen and Whitman took Ecstasy before they arrived. Scarminach was wearing a red shirt and shoes with red shoelaces. He was also sporting three red bandanas and intermittently wore one of them over his face.

Appellant, Huerta, Arellano, and Vaughan left the party on the east end and drove to the party in the Arbolada. Scarminach was sitting in the living room with Whitman and Garret Gross when appellant entered the room with Huerta and Arellano. Appellant asked Gross and Whitman where they were from. Gross and Whitman each replied that they were from Ojai. Appellant then focused on Scarminach and angrily said, "Stomps, OSL. Where the fuck are you from?"[2] Scarminach responded, "I don't need to answer to you." Appellant confronted Scarminach about the color of his clothing and referred to his shoes. Scarminach raised his feet in the air and asked, "Do you have a problem with my shoes?" The two began cursing at each other and Scarminach displayed a gang sign.

Appellant and Scarminach went outside and appellant demanded, "What do you claim." Scarminach responded, "Meiners Oaks," to which appellant replied, "OSL 13[.]"[3] Appellant and Scarminach were both agitated and prepared to fight. Nestingen, Whitman, Luna, and Huerta all urged them not to do so. Nestingen took Scarminach to a bedroom and told Scarminach's girlfriend, Krista

---

[2] Appellant's gang moniker was "Stomps" or "Stompers."

[3] Reference to the number 13, the numerical value of the letter M, connotes respect for the Mexican Mafia.

3

Petler, what had happened. Scarminach still wanted to fight appellant but Petler was able to calm him down. When another guest asked appellant what had happened, appellant alluded to an incident that had taken place at the skate park earlier that day.

Scarminach and his friends decided to go to Nestingen's house. Nestingen invited Vaughan and several others to join them but said, "Don't bring the Mexicans with you." Appellant and Huerta asked Vaughan if they could go with her. She told them they were not invited but agreed to give them a ride so long as they did not walk into the party with her. Arellano rode with someone else.

About 30 people attended the Meiners Oaks party, which was held in a guest house on the same property as Nestingen's house. When appellant arrived, Nestingen urged him and Scarminach to settle their differences. They both refused and walked away.

Just before 2:00 a.m., Scarminach and Petler went out on the porch. Appellant told Huerta he wanted to talk to Scarminach. Appellant, Huerta, and Arellano approached Scarminach and asked him to come off the porch and speak with them. Appellant told Scarminach that he wanted to fight. Appellant asked Scarminach where he was from and they both reiterated their gang affiliations. Petler tried to calm everyone down but Huerta pushed her back inside the guest house.

Appellant and Scarminach walked toward the front of the guest house and "square[d] off" against each other. Scarminach removed his outer shirt and baseball cap. The two then exchanged a few punches. Scarminach—who stood six feet and one-inch tall and weighed approximately 165 pounds—appeared to be getting the better of appellant, who was five feet and three inches tall and weighed about 130 pounds. Approximately 10 to 15 seconds after the first punch was thrown, appellant pulled out a concealed knife and stabbed Scarminach in the

4

stomach.  When Scarminach fell to the ground, appellant jumped on top of him and repeatedly stabbed and cut him.

Appellant ran down the driveway toward the street, leaving a trail of blood droplets.  Appellant called his mother, Jeanine Arellanes, and asked if she could pick him up.  Arellanes drove to the location appellant had given her and found him behind a parked car on the side of the road.  She chastised him for being out late but did not ask any questions.

Several people at the Meiners Oaks party called 911.  Nestingen told everyone that Scarminach had been hurt and asked them to leave.  Those who knew Scarminach stayed and surrounded him as he lay on the ground.  Nestingen summoned the help of his mother, an occupational therapist, who administered CPR to Scarminach until the paramedics arrived.  When the police arrived, several people identified appellant as the stabber.

Scarminach died at the scene.  The autopsy revealed that he had suffered 17 cuts and 7 or 8 stab wounds, 2 of which were independently fatal.  One was a deep, jagged stab wound over the right jaw that penetrated the neck and cut the carotid artery.  The other was a five- or six-inch deep stab wound through the chest that perforated the left lung and penetrated through the heart.  Scarminach also suffered three cuts to the back, a deep stab wound just below the neck that penetrated muscle and bone, four stabbing and cutting wounds to the side of the right temple, a long cut down the lower chest and waist, and a V-shaped stab wound to the wrist.  Scarminach's blood alcohol level was .07 at the time of his death and he tested positive for Ecstasy, marijuana, and the anti-seizure medication Dilantin.

Several hours after the killing, the police entered appellant's residence in Meiners Oaks to conduct a probation search.[4]  Appellant was alone and asleep in bed.  The officers woke him up and interviewed him.  During the interview,

---

[4] Appellant was on probation and was subject to search terms.

5

appellant removed a gauze bandage from his right hand and revealed "slice" injuries on the inside of his index and middle fingers. Appellant claimed he had suffered the injury while climbing a chain-link fence at school. He denied being present at the Meiners Oaks party and claimed he was at home all night. When the police interviewed Arellanes later that day, she said appellant had called her for a ride home the previous night and showed them where she picked him up. Arellano initially denied he was at the Meiners Oaks party, but later admitted he was present and witnessed the incident.

After appellant was arrested, the police searched his residence and cell phone and found numerous items indicative of gang activity. In July 2009, gang-related writings were confiscated from appellant's cell in juvenile hall, including one in which he identified himself as "an evil-minded gangster." In another writing he stated, "I see a red figure and I go pull the trigger," which was a reference to MOB members. Similar writings were confiscated three months later. In December 2009, appellant got into a fight with another MOB member. After the two were separated, appellant yelled, "Fuck you and your homie. May your homie rest in piss."

Ventura County Sheriff's Detective Steven Jenkins testified as the prosecution's gang expert. Detective Jenkins opined that OSL was a criminal street gang, that appellant was a member of the gang, and that he committed the crime for the gang's benefit. When presented with a hypothetical based on the facts of the case, Detective Jenkins said it described "a classic gang crime."

*Defense*

Appellant began seeing mental health professionals when was he was about six years old. His stepfather physically and emotionally abused him and his mother on a regular basis. When he was 10 to 11 years old, he starting running away from home. On one occasion, he threatened to kill himself and was placed in

6

a psychiatric facility. He was frequently truant from school by age 12 and was suspended from middle school for having a knife.

Dr. Ellen Yoshimura, a clinical psychologist employed by the Ventura County Behavioral Health Department, first met with appellant when he was 12 years old. She concluded that appellant was presently suffering from chronic post-traumatic stress disorder (PTSD) and anxiety due to the abuse his stepfather had inflicted on both him and his mother. The doctor also noted, however, that appellant got along well with his stepfather and was very close with him. Dr. Yoshimura began treating appellant on an ongoing basis a year after his arrest. She maintained appellant's PTSD diagnosis throughout his treatment and later added diagnoses of conduct disorder, obsessive-compulsive disorder (OCD), and anxiety disorder.

Dr. Sandor Dresnin, a psychiatrist who specializes in adolescents, first saw appellant when he was 12 and in juvenile hall for assaulting his mother. Dr. Dresnin treated appellant approximately 24 times over the next 6 years. Appellant's initial diagnosis was anxiety disorder with secondary PTSD, with the latter subsequently becoming more prominent. Dr. Dresnin subsequently added a diagnosis of conduct disorder, which is frequently a precursor of antisocial personality disorder. Appellant displayed symptoms of OCD and engaged in fights.

Dr. Donald Hoagland, a psychologist, was retained by the defense to evaluate appellant's mental status at the time of the offense. Dr. Hoagland met with appellant approximately 12 times beginning in April 2010. Dr. Hoagland diagnosed appellant as suffering from PTSD with dissociative features as of the date of the offense. The doctor also diagnosed appellant with conduct disorder and OCD, and in later 2011 added a diagnosis of Tourette's Syndrome. The diagnosis of PTSD was based in part on appellant's claim that he had been sexually abused by a female

7

family friend from around the age of four.[5]  Appellant had also reported experiencing dissociative reactions since the age of five.

Dr. Hoagland opined that appellant killed Scarminach "while he was in a dissociative state" in that "[h]e was separated from the reality of what he was doing, and he did not know or have awareness of what he was doing at the time.  It was a dissociation based on fear or survival."  This opinion was based on appellant's "perception" that Scarminach was lunging at him with a knife.  Dr. Hoagland acknowledged that his opinion was dependent upon unconfirmed information that appellant had conveyed to him.

Appellant also presented evidence of Scarminach's participation and interest in gang culture and his affiliations with the MOB and the Demons Motorcycle Club, the latter of which had ties to the Hell's Angels.  There was also evidence that on the afternoon before the murder, someone using Scarminach's computer accessed appellant's social media profile.

*Rebuttal*

Dr. Kris Mohandie, a clinical and forensic psychologist experienced in treating individuals suffering from PTSD and dissociative disorders, was retained by the prosecution to evaluate appellant.  Appellant refused to be evaluated.  Dr. Mohandie found no evidence that appellant was in a dissociative state or experiencing a posttraumatic reaction when he stabbed Scarminach.  The doctor believed that appellant's claims to that effect indicated malingering.  Dr. Mohandie diagnosed appellant with a severe, childhood-onset conduct disorder that had progressed to antisocial personality disorder by the time of trial.  Appellant also displayed characteristics of juvenile psychopathy.  Dr. Mohandie also concluded

---

[5] Appellant made this claim for the first time in May 2012.  He never told Dr. Dresnin about any sexual abuse.  Dr. Dresnin was "highly skeptical" of the claim of abuse given the timing of the allegation and surmised that appellant "could simply be manipulating the therapist regarding titillation, i.e., controlling or trying to build a new case for his defense."

8

that Dr. Hoagland's findings were invalid to the extent he deviated from the standard instructions for the personality and trauma symptom inventories he administered to appellant.

DISCUSSION

I.

*Scarminach's Mental Health Records*

During pretrial discovery, it was disclosed that Scarminach was receiving mental health treatment at the time of his death. Appellant subpoenaed Scarminach's mental health records and moved ex parte for their release. At appellant's request, unredacted versions of the motion, points and authorities, and counsel's supporting declarations were filed under seal "to safeguard attorney-client privileged communications and attorney work-product." Scarminach's mother asserted that the records were privileged and objected to their release. (Evid. Code, §§ 1012, 1013, subd. (c).) The Ventura County Behavioral Health Department also objected on grounds of confidentiality. (Welf. & Inst. Code, § 5328 et seq.) The People opposed the request and asked the court to review the records in camera to determine whether appellant had established good cause for their release.

The court rejected appellant's claim that the privilege had been waived. In a written decision, the court concluded that the records were both privileged and irrelevant to the proceedings and accordingly denied the request. The parties were given a redacted version of the court's decision, and the unredacted version (which includes references to privileged information contained in the subpoenaed records and counsel's declarations) was filed under seal.

Appellant asks us to review the sealed materials to determine whether the court abused its discretion in refusing to release the subpoenaed records regarding Scarminach's mental health treatment. We conclude the court had no duty to review the subpoenaed records in camera, much less release them to appellant. "[T]rial court[s are] not required, at the pretrial stage of the proceedings,

9

to review or grant discovery of privileged information in the hands of third party psychotherapy providers." (*People v. Hammon* (1997) 15 Cal.4th 1117, 1119.) Appellant's reliance on *People v. Reber* (1986) 177 Cal.App.3d 523, is unavailing because the case has been overruled on the very point for which it is offered. (*Hammon*, at p. 1123; see also *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 166 [recognizing same].)

We have reviewed the sealed materials and conclude the court did not abuse its discretion in finding that appellant failed to show good cause for release of the records and that the records are irrelevant and undiscoverable.

II.

*Sufficiency of the Evidence - First Degree Murder*

Appellant contends the evidence is insufficient to support his conviction of first degree murder on either of the theories proffered by the prosecution, i.e., that he (1) acted with premeditation and deliberation, and/or (2) committed the crime while lying in wait. (§ 189.) We disagree.

In reviewing claims of insufficient evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence—evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We accept the logical inferences that the jury might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) If the trier of fact's findings are reasonably justified by the circumstances, the opinion of the reviewing court that a contrary finding might also reasonably be reconciled with the circumstances does not warrant reversing the judgment. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

10

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "'The true test is not the duration of time as much as it is the extent of the reflection.' [Citations.] . . . '[T]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citation.] . . . [A] killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse. [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)

*People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) discusses three types of evidence that are commonly shown in cases of premeditated murder: planning activity, preexisting motive, and manner of killing. (*Id.* at pp. 26-27.) However, "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

The evidence is sufficient to support a finding that appellant acted with premeditation and deliberation in killing Scarminach. Detective Jenkins accurately described it as "a classic gang crime." Motive can be inferred from the fact that the murder was gang-related. (See *People v. Gonzales* (2011) 52 Cal.4th 254, 295; *People v. Sandoval* (1992) 4 Cal.4th 155, 175.) Appellant's plan to commit the crime can be inferred from the evidence that he and Scarminach had encountered each other earlier that day, the manner in which he sought out Scarminach and repeatedly approached him to solicit an altercation, and the fact that he armed himself with a knife. (See *People v. Romero* (2008) 44 Cal.4th 386, 401 [defendant's decision to arm himself with a weapon supported inference that he planned to use it to kill rival gang members, such that he could be found to have

acted with premeditation and deliberation].)  Finally, the manner in which appellant committed the killing—which included cutting Scarminach's throat and inflicting other wounds that were plainly calculated to result in his death— amply supports the finding that he acted with premeditation and deliberation.  (See *People v. Hernandez* (1988) 47 Cal.3d 315, 350 ["calculated" rather than "random" manner of killing may support finding of premeditated murder]; *Anderson*, *supra*, 70 Cal.2d at p. 27 ["exacting" manner of killing is indicative of premeditation].)

In light of our conclusion that the evidence is sufficient to support the finding that appellant killed Scarminach with premeditation and deliberation, we need not decide whether the evidence supports a finding that he committed the crime while lying in wait.  (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

III.

*Alleged Instructional Errors*

A.

*Voluntary Manslaughter*

Appellant claims the court erred in refusing to instruct the jury on voluntary manslaughter based on sudden quarrel/heat of passion.  We conclude otherwise.

In a criminal matter, a trial court must instruct the jury on general principles of law relevant to issues raised by the evidence.  (*People v. Walker* (2015) 237 Cal.App.4th 111, 114.)  This requirement includes instructing a jury on a lesser included offense "if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense.  [Citation.]"  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  There must be some basis, "'other than an unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged.' [Citations.]"  (*Walker*, at p. 117.)  The obligation to instruct on lesser included offenses applies even absent a request from the defendant for an

12

instruction and over a defendant's express objection to an instruction. (*Id.* at p. 115.) But the court has no duty "to instruct on theories that have no such evidentiary support. [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

A defendant who commits an intentional and unlawful killing lacks malice when the defendant acts as a result of a sudden quarrel or heat of passion. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) Such heat of passion or provocation is a "'theor[y] of partial exculpation' that reduce[s] murder to manslaughter by negating the element of malice [Citation.]" (*Ibid.*)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "'"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]' [Citation.]" (*Moye*, *supra*, 47 Cal.4th at p. 549.) "'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*Id.* at p. 550.) Since the test is an objective one, a defendant's particular susceptibilities are irrelevant. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.) "'[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*Steele*, *supra*, at pp. 1252-1253.)

During the jury instructions conference, the parties agreed that the jury should be instructed on voluntary manslaughter because, as the court put it, "the jurors could find that it's a killing where there's an intent to kill but where

13

there's no malice aforethought." The prosecutor objected, however, to defense counsel's request that the jury also be instructed on provocation (CALCRIM No. 522) and sudden quarrel/heat of passion (CALCRIM No. 570). The prosecutor asserted that these instructions were unwarranted because there was no evidence that appellant was either provoked or had killed Scarminach because of a sudden quarrel or while in the heat of passion. The court reserved its ruling as to both proffered instructions.

When the parties reconvened a few days later, the prosecutor withdrew its request for a voluntary manslaughter instruction "unless the court finds that one of the requested instructions, imperfect self-defense provocation or heat of passion[,] is appropriate." The court replied that it was disinclined to give any of the three instructions because "there is no evidence in this record at all of what the state of mind of the defendant was." Defense counsel complained that "there was an agreement that voluntary [manslaughter] was going to be given, albeit it was on a different theory." After giving defense counsel additional time to research the issue, the court formally declined to instruct the jury on voluntary manslaughter or sudden quarrel/heat of passion. The court noted "a failure to proof of a normal component of heat of passion on these facts" and reasoned that "[m]utual consent to have a fight because the people involved are from different gangs" did not support a theory of voluntary manslaughter. The jury was, however, instructed on provocation as it related to the determination whether appellant was guilty of first or second degree murder.[6]

The court did not err in refusing to instruct on voluntary manslaughter or sudden quarrel/heat of passion. As appellant acknowledges, our Supreme Court

---

[6] The jury was instructed in accordance with CALCRIM No. 522 as follows: "Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

14

has repeatedly "rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter. [Citations.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) He nevertheless purports to distinguish the instant case on the ground that "the altercation progressed well beyond verbal posturing and manifested into a physical fight."

If anything, the circumstances provide further support for our conclusion that instructions on voluntary manslaughter were properly refused. "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.] '[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.]" (*People v. Avila* (2009) 46 Cal.4th 680, 705.) The evidence at trial demonstrated that appellant initiated the altercation by approaching Scarminach and asking him to identify his gang affiliation. Moreover, there was no "sudden quarrel" here. Appellant and Scarminach each challenged the other to fight on more than one occasion over the course of the night. After it appeared that the situation had been defused, appellant called Scarminach aside and yet again instigated a fight. When they finally agreed to fight, they each walked to a separate area and "squared off." Less than 20 seconds after they began hitting each other, appellant pulled out a knife and stabbed Scarminach. Nothing Scarminach said or did that night could have been found by the jury to have "arouse[d] feelings of homicidal rage or passion in an ordinarily reasonable person," such that appellant was guilty of no more than voluntary manslaughter. (*People v. Pride* (1992) 3 Cal.4th 195, 250; *Avila*, *supra*, at p. 706.)

Appellant also asserts that the error in failing to instruct on voluntary manslaughter had the additional consequence of violating his due process rights by effectively removing from the jury's consideration an essential element of the crime

of murder, i.e., the absence of provocation. This assertion, however, merely begs the question whether there was any evidence of provocation. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 158, fn. 20, italics added, citation omitted [recognizing "that *when provocation is put at issue*, proof of malice requires the prosecution to prove the absence of provocation"]; see also *People v. Rios* (2000) 23 Cal.4th 450, 461-462, citations omitted ["[U]nless the People's own evidence suggests that the killing may have been provoked . . ., it is the *defendant's* obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder"].) Despite the fact that no such evidence was present here, appellant's claim is belied by the fact that the jurors were instructed they could convict appellant of second degree murder if they found he was provoked. (CALCRIM No. 522.)

## B.

### *Involuntary Manslaughter*

Appellant contends the court also violated a sua sponte duty to instruct the jury on involuntary manslaughter based on the theory that appellant suffered from a mental disorder that prevented him from forming the intent to kill. We are not persuaded.

Involuntary manslaughter occurs where there is an unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Evidence of a mental disorder is admissible and relevant to prove that a defendant lacked the specific intent to kill, such that he or she could be found guilty of no more than involuntary manslaughter. (§ 28; *People v. Rogers* (2006) 39 Cal.4th 826, 884.)

Dr. Hoagland's testimony that appellant committed the crime while in a dissociative state was insufficient to require instructions on involuntary

16

manslaughter. The doctor's testimony on this point was of no assistance. "[A]ny material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' [Citation.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618, disapproved on another ground in *People v. Sanchez* (June 30, 2016) __ Cal.4th __ 2016 WL3557001, *13, fn. 13.) Dr. Hoagland's opinion is based on appellant's inadmissible hearsay statements, and the jury was instructed that the doctor's reliance on those statements could not be considered "as proof that the information contained in the statements is true." (CALCRIM No. 360.) We presume the jury understood and followed this instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Even if the court should have instructed on involuntary manslaughter, the error would be harmless. Under the instructions that were actually given, the jury necessarily would have acquitted appellant had it found that he lacked the intent to kill by reason of a mental disorder. (CALCRIM. No. 3428.) In convicting him of first degree murder the jury found he "acted with express malice, necessarily rejecting the view that the killing was manslaughter. Because the jury resolved the factual finding requisite to involuntary manslaughter against [appellant], he cannot have been prejudiced by the lack of an instruction on involuntary manslaughter instruction [*sic*]. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

IV.

*Denial of Defense Request to Reopen*

Appellant contends the court erred in denying his request to reopen after both sides had rested so that he could testify in his own behalf. He claims the refusal amounts to a violation of his constitutional rights to due process and a fair trial and his right to present a defense. We are not persuaded.

17

"The decision to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court. [Citations.]"  (*People v. Jones* (2012) 54 Cal.4th 1, 66.)  "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.'  [Citation.]" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110 (*Jones*).)

When the defense rested, the court had yet to decide whether to instruct the jury on voluntary manslaughter based on sudden quarrel or heat of passion.  The court did not announce its decision until after both sides had rested.  Defense counsel then asked the court to allow appellant to testify, claiming she had advised him not to do so based on the prior understanding that the jury would be instructed on voluntary manslaughter.  Counsel acknowledged, however, that there was no prior understanding that the court would instruct on sudden quarrel/heat of passion voluntary manslaughter and that the prosecutor had objected to any such instructions.  Counsel added that it would also be necessary to recall Dr. Hoagland and the defense's gang expert.

The court denied the request to reopen.  In addition to pointing out that appellant had several opportunities to testify during trial and that Dr. Hoagland's testimony had been fatally undermined by his failure to do so, the court also reasoned that "[t]he defendant doesn't necessarily in any case get to know what the jury instructions are going to look like before he decides whether to testify . . . . [¶]  [L]ike any other defendant, [he] makes his decision about what evidence to put out there and the Court decides based on the evidence that's been put out there what the instructions are going to be.  Not the other way around. . . .  The instructions follow the presentation of proof."

18

The court did not abuse its discretion. The late stage of the proceedings plainly weighed in favor of the court's ruling. Appellant also had ample opportunity to testify. Although defense counsel claimed she had advised appellant not to testify based upon the parties' earlier agreement that the jury would be instructed on voluntary manslaughter, counsel knew that the agreement related to a theory other than sudden quarrel/heat of passion. Given the late stage of the proceedings, there was also a danger that the jury would accord undue emphasis to the new evidence. Finally, the significance of the evidence cannot be assessed because counsel declined to make an offer of proof as to the substance of appellant's proposed testimony.

Appellant's argument that the court abused its discretion in denying his request to reopen consists of an inapt analogy to *Jones*, *supra*, 30 Cal.4th 1084, in which the court found an abuse of discretion in refusing to reopen after both sides had rested, and an unsuccessful attempt to meaningfully distinguish *People v. Earley* (2004) 122 Cal.App.4th 542 (*Earley*), in which the court found no abuse of discretion. In *Jones*, the defendant merely sought to reopen in order to lay the foundation for a photograph of a man who was also depicted in other photographs that had been admitted into evidence, and a photograph of another man who had actually been present in court. (*Jones*, *supra*, at p. 1110.) In reversing, the court reasoned that reopening for such a limited purpose would not have resulted in an undue consumption of time and that no further evidence would have been introduced. (*Id.* at p. 1111.) This bears no resemblance to the instant case, which, among other things, would have required the recalling of witnesses who had already been excused.

*Earley* is much closer to the instant case. The trial court in *Earley*, like the trial court here, refused to reopen so that the defendant could testify after both sides had rested but before the jury had been instructed. In concluding that this ruling was not an abuse of discretion, the Court of Appeal reasoned in part that

19

"[h]ad [the] defendant been permitted to testify it would have prolonged the trial and may have required the prosecution to present rebuttal testimony from an expert who, in turn, would first have to conduct further testing." (*Earley*, *supra*, 122 Cal.App.4th at p. 546.) Although the court also concluded that the defendant's proffered testimony "did not propose to offer any new, particularly significant, evidence" (*ibid.*), here we can only surmise as to the substance and extent of the proposed testimony. In any event, *Earley* does not purport to set a benchmark for rulings on motions to reopen to allow a defendant to testify. The decision whether to reopen in these circumstances "is almost wholly within the discretion of the trial judge" and "[h]is ruling must stand in the absence of a clear showing of abuse of discretion. [Citation.]" (*People v. Kohn* (1968) 258 Cal.App.2d 368, 377.) Appellant fails to make such a showing here.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

20

James P. Cloninger, Judge

Superior Court County of Ventura

_____

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.